[No. 24568. Department Two. November 2, 1933.]

ERNST LAPPENBUSCH, *Respondent,* v. STEPHEN FLORKOW
et al., *Appellants.*[1]

*J. Charles Dennis,* for appellants.

*A. O. Burmeister* and *J. H. Gordon,* for respondent.

TOLMAN, J.—Respondent, as plaintiff, prosecuted this action to quiet title to the west half of the southeast quarter ($W\frac{1}{2}SE\frac{1}{4}$) of section 14, township 20 north, range 5 E. W. M., in Pierce county. Defendants Florkow and wife had record title to the east half of the southwest quarter ($E\frac{1}{2}SW\frac{1}{4}$) of the same section, and the controversy is over the location of the dividing line between the two tracts of land.

[1]Reported in 26 P. (2d) 388.

The trial court found the record title to be as indicated, and upon the vital points found the facts to be:

"That for more than thirty years last past, and until the same was destroyed by defendant Florkow approximately two years ago, a division fence was in existence dividing the above described premises of the plaintiff from the above described premises of the defendant. That the south quarter corner of said section, as established by the original government survey, is at the present time identified by a stone monument upon the south line of said section. That the location of the north quarter corner of said section, as established by the original government survey, is lost and is incapable of identification. That the northeast corner of said section and the northwest corner of said section, as established by the original government survey, are identified by stone monuments at each corner. That said fence above described, beginning at the south quarter corner of said section as so identified, ran for approximately seventy rods on a direct line from said south quarter corner toward a point midway between the northeast corner and the northwest corner of said section as above identified. That said fence continued on northerly but not on a straight line, and from a point approximately seventy rods north of said south quarter corner of said section the fence turned westerly into the premises of defendant, and after running an irregular course through said premises crosses the north and south center line of said section, as determined by a line drawn from said south quarter corner to said midway point on said north line of said section, a few feet south of the center of said section, and from that point proceeded northeasterly to the east and west center line of said section. That said plaintiff at all times since he acquired title to his said premises hereinabove described, occupied up to the line of said fence, using said premises as a pasture for his cattle, and at all times claimed the straight portion of said fence, to-wit, approximately the south seventy rods thereof, as the dividing line between said premises and the premises of defendants and their predecessors in interest to the west, and at all times claimed the line

as defined by the straight portion of said fence on the south end thereof as the west line of his premises, and that his occupation up to said line of said premises has been at all times open, notorious and adverse. That said plaintiff, the said defendant Florkow, and the predecessors in interest of said defendant Florkow have from time to time jointly and by mutual agreement repaired said fence and maintained the same as a division line between said premises.''

A judgment followed in accordance with the prayer of the complaint from which the defendants Florkow and wife have appealed.

The findings, as quoted, present two questions, namely: (1) Was the quarter corner on the north line of the section lost and incapable of identification; and, (2) was there such adverse possession as to ripen into title?

These questions are in a large degree questions of fact, and we are bound by the findings of the trial court unless convinced that the evidence preponderates against them.

We start with the admitted rule that the government monument will prevail over the field notes if there be inconsistency, *Cadeau v. Elliott*, 7 Wash. 205, 34 Pac. 916; *Thayer v. Spokane County*, 36 Wash. 63, 78 Pac. 200; and therefore the chief question is, Has the government monument, as originally located, been preserved?

We cannot detail all of the evidence upon this point. It must suffice to say that appellants called as their witness one W. P. Wood, a civil engineer who had been county engineer from 1886 to 1892 and thereafter employed in the county engineer's office, and who had first surveyed the north line of the section and located the quarter corner in the year 1883. He testified positively that he then located the government monument which marked the disputed quarter corner at the

point where the appellants now claim it to be. Again, in 1891, while he was county engineer, he made another survey of this same line, located the quarter corner monument as placed by the government surveyors, and then placed there a stone monument which was still there at the time of the trial below. Subsequent surveys by others seem to confirm Mr. Wood's testimony and nothing directly disputes it, except the government field notes.

These surveys, made by Mr. Wood long before the present controversy arose when he was acting in an official capacity, and when he could have had no interest except to perform his professional and official duty and to perpetuate the corner as located by the government survey, cannot be brushed aside or overcome by the testimony of nonprofessional witnesses, more or less interested, and who gave their recollections of conditions as they observed them long ago, when they had no particular reason for careful observation and apparently no reason at all for charging their memory with any exactness. They made no field notes from which to refresh their recollection, as did Mr. Wood in both of his early surveys; and we cannot think that the force of Mr. Wood's testimony is in any degree lessened by this character of evidence.

It is true that respondent introduced a Mr. Montgomery, an engineer, as a witness, who made a survey apparently for him a short time before the action was commenced. Mr. Montgomery testified that he looked for, but did not find, a government monument marking the quarter corner in question. He did find the monument placed by Mr. Wood, and disregarded it, because, apparently, it was not in the place called for by the government field notes. There is nothing in all this which lessens the effect of Mr. Wood's testimony. Quite clearly evidences of a government monument

might have been very apparent in 1883 and in 1891, and those evidences might have very well wholly disappeared in the forty years, or more, which intervened before Montgomery made his survey. There was some evidence indicating a possibility that Wood's monument may have been moved, but Wood's testimony from his own earlier field notes is positively to the contrary, is much more convincing, and must prevail.

The burden of proof was upon the respondent to establish that the government corner was lost before he was entitled to apply the rule by which his engineer Montgomery located the corner, half way between the east and west corners of the section. Having failed to meet the burden, the proof, as we see it, preponderating to the contrary, he cannot prevail upon this issue.

On the question of adverse possession, we have here a case very similar in its facts to the case of *White v. Branchick,* 160 Wash. 697, 295 Pac. 929, in which the character of the fence and its purpose and use were much the same.

The fence was built and maintained to turn cattle, and though it started from the known south quarter corner and ran for approximately seventy rods in a direct line toward the point at which the north quarter corner would normally be, as found by the trial court, still it must be remembered that the north quarter corner was a mile distant from the point at which the fence started; and it is not suggested by any evidence in the case that the builders of the fence ever undertook to locate the north quarter corner, or in any way made any attempt to determine the line or to build the fence upon the line. Quite the contrary, after the first seventy rods, the fence was so irregular in its course as to practically negative any idea that it was ever intended to be a line fence in any part. The intent of the builders cannot be determined from anything less

than the whole product. Each part of the fence was a portion of the whole, and the purpose of the whole was, apparently, born of the necessity of controlling the ranging of cattle. The fence, taken as a whole, lacks every element of a deliberate attempt to define a boundary or locate the dividing line between adjoining holdings.

It must be borne in mind that the fence was built more than thirty-two years before the time of the trial. The parties to this action had no part in its building, and no one attempts to say what the purpose of the builders then was. That purpose, as we have already seen, must be gathered from what they did. Respondent's land in the vicinity of the fence was covered with timber and brush. The practical use of the fence was to turn cattle, and both parties to this action apparently did sufficient to maintain the fence for that purpose.

The respondent's attitude now is that, because the fence was there when he bought the land, he regarded it as a line fence, but he does not indicate that he, by act or word, ever disclosed that attitude to any one. The hostile flag of an adverse claim was never unfurled. There was no open and notorious claim of right, and nothing done or said which would tend to warn the adjoining owner of such a claim. We find nothing in the situation indicating an open and notorious hostile intent, which is always necessary in order to establish title by prescription. *Cameron v. Bustard,* 119 Wash. 266, 205 Pac. 385; *Santmeyer v. Clemmancs,* 147 Wash. 354, 266 Pac. 148; *Wells v. Parks,* 148 Wash. 328, 268 Pac. 889.

Respondent having failed to establish title to the disputed strip, his complaint must be dismissed, but appellants by their answer pray that their title thereto be established, and therefore the judgment is reversed,

and the cause remanded for the entry of a judgment in harmony with the views expressed.

Reversed and remanded.

BEALS, C. J., HOLCOMB, BLAKE, and GERAGHTY, JJ., concur.